PD-1544-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/30/2015 10:26:04 AM
Accepted 12/30/2015 12:31:50 PM
ABEL ACOSTA
CLERK

No. _____

IN THE
COURT OF CRIMINAL APPEALS
FOR THE STATE OF TEXAS

Trial Court No. 85250-A
Court of Appeals No. 09-14-00441-CR

* * * *

FILED IN
COURT OF CRIMINAL APPEALS

December 30, 2015

ABEL ACOSTA, CLERK

JOE EDWARD LARUE
Appellant

v.

THE STATE OF TEXAS,
Appellee

* * * *

Appealed from the Court of Appeals for the
Ninth Judicial District of Texas
Sitting at Beaumont

* * * *

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
ORAL ARGUMENT REQUESTED

* * * *

December 30, 2015

Walter M. Reaves Jr.
100 N. 6th Street, Suite 802
Waco, Texas 76701
(254) 296-0020
FAX# (877) 726-4411
Attorney for Appellant

NAMES OF THE PARTIES TO THE FINAL JUDGMENT

STATES OF TEXAS:

**Ramon Rodriguez**
**Pat Knauth**
Assistant Jefferson County District Attorneys
1085 Pearl Street, Suite 300
Beaumont, TX 77701


APPELLANT'S TRIAL COUNSEL

**Doug Barlow**
485 Milam
Beaumont, Texas77701
**Brack Jones**
77705 Calder
Beaumont, Texas 77706


TRIAL JUDGE

**The Honorable Lindsey Scott**
252nd District Court
Jefferson County Courthouse
1085 Pearl Street
Beaumont, TX 77701

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

LIST OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . 2

GROUNDS FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

REASONS FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    The Court of Appeals erred in failing to properly review the evidence and determine whether there was at least a 51% chance that appellant would not have been convicted if exculpatory results had been available during trial. . . . . . . . . . . . . . . . . . . . . 1

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

APPENDIX - Court of Appeals Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# LIST OF AUTHORITIES

## STATE CASES

*Esparaza v. State*, 282 S.W.3d 913 (Tex. Crim. App. 2009) . . . . . . . . . . . . . . . . . . . . . . 2

*Larue v. State*, No. 09-05-145-CR (Tex. App. - Beaumont, May 23, 2007) . . . . . . . . . . 1

*Routier v. State*, 273 S.W.3d 241 (Tex. Crim. App. 2008) . . . . . . . . . . . . . . . . . . . . . 2, 2

*Smith v. State*, 165 S.W.3d 361 (Tex. Crim. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . 2

## STATUTES AND RULES

## STATEMENT OF THE CASE

Appellant was originally indicted for the offense of capital murder in 1991. That indictment was dismissed in 1994, and the case remained dormant until Appellant was indicted again in 2001. Trial commenced in 2003, but the proceedings were stayed after the trial court granted appellant's motion to suppress the results of DNA testing. Following a successful appeal by the State, the trial proceeded. Before the case was submitted to the jury appellant waived his right to a jury trial, in return for the State's waiver of the death penalty. The trial court continued to hear evidence, and ultimately found appellant guilty and sentenced him to life in the Texas Department of Justice.

Appellant appealed his convicted and sentence to the Ninth Court of Appeals in Beaumont, which affirmed both the conviction and sentence. *Larue v. State*, No. 09-05-145-CR (Tex. App. - Beaumont, May 23, 2007) Appellant subsequently filed a Motion for Forensic Testing, which was denied by the trial court on August 26, 2014.

## PROCEDURAL HISTORY

Appellant timely filed notice of appeal, and took his appeal to the Court of Appeals for the Ninth Judicial District, sitting at Beaumont, Texas. In a memorandum opinion, dated October 28, 2015, the Court found affirmed the judgement and order of the trial court. Appellant now timely files this petition for discretionary review.

1

## QUESTIONS PRESENTED FOR REVIEW

## GROUNDS FOR REVIEW

1. The Court of Appeals failed to review the evidence under the assumption that new testing produced exculpatory results, and failed to consider what those results would have included.

2. The Court of Appeals failed to fully review the evidence, and determine whether there was more than a 51% chance that appellant would not have been convicted it the exculpatory results had existed at the time of trial.

3. The Court of Appeals failed to fully review the evidence and consider how the exculpatory test results could have supported his defense.

## REASONS FOR REVIEW

The Court of Appeals has decided an important issue of State law in a way that is in conflict with this Court's decision in *Routier v. State*, 273 S.W.3d 241 (Tex. Crim. App. 2008), by failing to assume the requesting testing produced exculpatory results, and determine whether there is more than a 51% chance that appellant would not have been convicted if those results had been available at trial.

2

REASONS FOR REVIEW

REASONS FOR REVIEW

**The Court of Appeals erred in failing to properly review the evidence and determine whether there was at least a 51% chance that appellant would not have been convicted if exculpatory results had been available during trial.**

During the investigation of this case numerous samples containing biological material were collected by law enforcement. Those include the following:

- oral swabs taken from the victim
- hair found on the victim's hand
- cigarette butt found at the scene
- bloody fingerprint found on door
- fingernail scrapings
- blood samples from a t-shirt worn by a potential suspect

With the exception of the t-shirt and fingerprint, these items have been tested with varying results. The oral swabs have been tested several times over the years by different labs, using different techniques. The oral swab was originally tested in 1990 and 1991. It was also tested again in 2001, along with other items. The result of the testing was that appellant could not be excluded as a donor for both the oral swab and the fingernail clippings.

Following his conviction, appellant filed a motion pursuant to Chapter 64 of th Texas Code of Criminal Procedure. The State opposed the motion, and it was denied by the trial court without a hearing. That decision was affirmed by the Court of Appeals.

*Law and Standard of Review*

Post-conviction DNA testing is governed by Chapter 64 of the Texas Code of

1

Criminal Procedure. Art. 64.03 establishes the requirements for ordering the testing of evidence, and requires the Court to order testing when a defendant establishes by a "preponderance of the evidence ...that the person would not have been convicted if exculpatory results had been obtained through DNA testing."[1]

The Standard of review from an appeal of an order denying testing is a familiar one. The reviewing court must defer to the trial judge's findings of fact when they are supported by the record, as well as defer to a trial judge's "application of law to fact questions" when that determination turns on credibility and demeanor. Pure legal issues are reviewed *de novo*. See, *Esparaza v. State*, 282 S.W.3d 913 (Tex. Crim. App. 2009) In this case the trial court made no findings on appellant's motion, but instead simply entered an order denying it; therefore review is *de novo*. See, *Smith v. State*, 165 S.W.3d 361 (Tex. Crim. App. 2005) While the Court correctly identified the proper standard of review, appellant suggests the Court failed to properly apply it.

In determining whether a defendant is entitled to testing he need only show a 51% chance that he would not have been convicted if exculpatory results had been available. *Smith*. In making that determination, the court must assume the evidence is tested, and exculpatory results obtained, and then determine what impact those results would have had on the case. *Routier v. State*, 273 S.W.3d 241 (Tex. Crim. App. 2008) Appellant suggests the

---

[1] A defendant must establish "identity was an issue in the case." That was clearly established in this case since appellant has always maintained his innocence. He must also establish the evidence is available for testing and the chain of custody has been maintained, which the State conceded in its response.

2

Court of Appeals erred in failing to review the evidence under this standard.

*The Court failed to consider the possibility that the sample used for comparison was contaminated or mis-labeled and what impact that would have on re-testing*

As set forth above, the oral swabs have been tested at different times - and by different labs - with varying results. Two different labs reached different results when typing appellant's blood. with one concluding he was type "O" and the other concluding he was type "A". Either one of the labs botched a simple, basic test, or the sample used in all subsequent testing either did not belong to appellant, or was contaminated. [2]. If there was problem with the sample, then none of results subsequently obtained would be valid.

The discrepancy between the two reports is not the only reason to question the integrity of appellant's blood sample. Appellant obtained an affidavit from Ron Singer in 1994,[3] which apparently was a factor in the decision to dismiss the indictment pending at that time; that affidavit pointed to problems and inconsistencies with both the reports from Baylor, and GeneScreen, which raised the possibility that appellant might not be the donor.[4]

---

[2] In his motion, Appellant argued the likelihood that the Jefferson County lab simply erred in reporting the result is slight, in light of all the other tests done. In addition to samples from appellant, samples from five other suspects were submitted. A sample from the victim was also submitted. The results obtained by the Texas Department Safety from typing the victim's sample, as well as the results from the five other suspects werethe same as those obtained by Jefferson County. The only difference was in appellant's results. Interestingly, appellant was the only suspect who had only one vial of blood submitted. All of the others had two vials.

[3] Mr. Singer is currently the director of the crime lab at the Tarrant County Medical Examiner's office.

[4] Singer pointed out a possible error in labeling the male and female portions of the oral swab, as well as possible errors in interpretation.

3

As noted above, the Court must assume the testing produces exculpatory results. Such results would not simply be the identification of another contributor; it could include the exclusion of appellant as a possible contributor. In other words, the State would be left with evidence that suggested someone else had oral sex with the victim before her death. Appellant suggests the Court of Appeals failed to consider that possibility.

*The Court of Appeals did not review evidence with the assumption that testing produced exculpatory results*

As noted above, when determining whether a request to test should be granted the Court must assume that exculpatory results are obtained, and decide whether there is more than a 51% chance that he would not have been convicted if the results were available. Appellant suggests the Court erred in two respects when reviewing the evidence in this case. First, the Court did not assume that new testing produced exculpatory results, and consider what those results would have been. Secondly, the Court failed to evaluate the evidence in light of that assumption, and decide if there was more than a 51% chance he would not have been convicted.

In reviewing the evidence regarding the oral swabs, the Court of Appeals held that appellant "failed to explain how such results would effect his conviction in light of other inculpatory evidence." The Court also held that appellant had not established "that new results would be more probative than the evidence that the court considered." The Court did not elaborate, and failed to address how exculpatory results would have supported his

4

defense. Appellant's defense was that he had oral sex with the victim, and that when he left she was alive. If the semen in the oral swab did not match appellant, it would mean that someone else had oral sex with her, presumably after he left.[5] It is difficult to imagine how that would not place the evidence in a different light. At a minimum, it would support the assumption that someone else was with her after he left. Taken along with the testimony from Dr. Benjamin, appellant could have argued that any semen he may left must have been before she was killed, which necessarily means he was not the killer. The Court of Appeals failed to address those possibilities, and in doing so appellant suggests the Court erred.

The evidence concerning the shirt is even more compelling. One of the suspects initially identified by police was Jackie Augustine. He was a known drug dealer, who had provided drugs to the victim. He also had a prior murder charge, although the disposition of that charge was not entirely clear. Police Chief Marsh talked with Augustine on August 18, and noticed blood on his shirt. (20 R.R. 8 -9) The shirt was taken as evidence, and submitted to the local lab, and later to the Texas Department of Public Safety. Initial testing indicated blood was on the shirt, but no results were ever obtained. (20 R.R. 13, 15) While blood samples were taken from several suspects, no samples were taken from Augustine, and therefore no comparison could be made with him.

---

[5]Appellant presented testimony from Dr. Richard Benjamin regarding the length of time sperm could remain in the mouth following oral sex. His testimony was essentially that there are no scientific estimates as to how long semen could remain in the mouth since there had never been any testing or experiments done to establish that. He also testified it would remain longer following death. Therefore, if appellant did have oral sex with the victim earlier in the evening there is a chance that could have already been gone, and what remained would be semen left by whoever killed her.

5

In addition to seeing Augustine with blood on his shirt, the police chief had also received information from a crime stoppers call that identified 2 people other than defendant as the perpetrators of the offense. (20 R.R. 10) The information came from Gary Byrd, who also testified at trial.

In considering the significance of the t-shirt the Court of Appeals reviewed appellant's statement, and held that even if the blood on Augustine's shirt matched the victim it "would not be more probative than the evidence that was already before the court." The Court fails to recognize that the evidence before the Court came from appellant's statement, which the State forcefully argued was not truthful. Despite the Court's summary conclusion, exculpatory results would have corroborated appellant's story, and made it more believable. Additionally, the State made no attempt to suggest there was any other way the blood could have gotten on Augustine's shirt. It could have only been there if he was nearby when she was murdered. Since there was no suggestion that appellant was with Augustine at the time, it is impossible to argue such evidence would not be persuasive. Appellant suggests at a minimum it establishes more than a 51% chance that he would not have been convicted. If the Court of Appeals had reviewed the evidence using this standard, appellant suggests it would have reached the same result.

PRAYER

WHEREFORE, APPELLANT PRAYS the court grant this petition, reverse the decision of the Court of Appeals and remand the case for further consideration.

6

Respectfully Submitted,


/s/ Walter M. Reaves, Jr.
Walter M. Reaves Jr.
100 N. 6th Street, Suite 802
Waco, TX  76701
(254) 296-0020
FAX # (877) 726-4411
TBA#16644200
walterreaves@att.net

Attorney for Defendant


## CERTIFICATE OF SERVICE


I hereby certify that a copy of the foregoing petition for discretionary review has been delivered to Bob Wortham, District Attorney for Jefferson County, Texas, and to the State Prosecuting Attorney, P.O. Box 12405, Austin, Texas 78711, on this the 30th day of December, 2015.


/s/ Walter M. Reaves, Jr.
Walter M. Reaves Jr.

In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-14-00441-CR
_____

JOE EDWARD LARUE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 252nd District Court
Jefferson County, Texas
Trial Cause No. 85250-A

MEMORANDUM OPINION

Joe Edward LaRue (LaRue) was convicted of the capital murder of Donna Pentecost and he was sentenced to life imprisonment. LaRue filed a Motion for Forensic DNA Testing (hereinafter "post-conviction motion"). *See* Tex. Code Crim. Proc. Ann. art. 64.01 (West Supp. 2014). LaRue appeals the trial court's denial of his post-conviction motion. *See id.* art. 64.05 (West 2006). We affirm.

1

BACKGROUND

This Court previously issued two opinions in two appeals pertaining to LaRue's underlying trial and conviction. *See State v. LaRue*, 108 S.W.3d 431, 433-34 (Tex. App.—Beaumont 2003), *aff'd*, 152 S.W.3d 95 (Tex. Crim. App. 2004) (hereinafter *LaRue I*) (reversing the trial court's grant of LaRue's motion to suppress certain DNA evidence); *LaRue v. State*, No. 09-05-145-CR, 2007 Tex. App. LEXIS 4072 (Tex. App.—Beaumont May 23, 2007, pet. ref'd) (not designated for publication) (hereinafter *LaRue II*) (affirming LaRue's conviction). The facts in the underlying trial were detailed in *LaRue II*. We briefly outline the facts as necessary to the issue now before us in this appeal.

Donna Pentecost (Pentecost) was found murdered on or about October 15, 1989. *LaRue II*, 2007 Tex. App. LEXIS 4072, at *1. Her naked body was lying on the ground in the backyard of the residence where she lived. *Id.* at *3. Pentecost had an injury to her skull. *Id.* It appeared her body had been moved slightly from the actual place where the damage to the head occurred. *Id.* There was also bruising up and down her back, on her left calf, and on her shoulder blades. *Id.*

Initially, LaRue was one of six suspects in Pentecost's murder. *Id.* at *5. LaRue, Pentecost, and a couple of the other suspects worked at the same company. *Id.* at **1, 4-5, 11, 14. In 1989, DNA testing was unsuccessful in determining

2

Pentecost's killer. *Id.* at *1. As a result of significant advancements in DNA testing after the time of the murder, evidence taken from the victim's mouth was retested in 2000, and the Texas Department of Public Safety crime lab report identified the material as LaRue's semen. *Id.* LaRue was indicted for the murder of Pentecost. *Id.* at **1-2.

In March and April of 2000, the State submitted certain evidence for DNA testing and analysis, including oral swabs, oral slides, DNA extracts and blood cards from Pentecost, a blood vial and bloodstain from LaRue, a shirt from Pentecost's body, and a cigarette butt found at the scene. *LaRue I*, 108 S.W.3d at 433. The State received the results from these submissions in September of 2000. *Id.* at 433-34. In December of 2001, the State submitted additional items for DNA testing and analysis, including fingernail samples, hair, and swabs. *Id.* at 434. The State provided the results from these tests to the defense in February of 2003. *Id.*

According to the test results, Pentecost and LaRue were excluded from the contributors of the stain found on the cigarette butt. *LaRue II*, 2007 Tex. App. LEXIS 4072, at *8. However, LaRue could not be excluded as the contributor of two stains from Pentecost's right hand fingernail samples. *Id.* at **8-9. Additionally, two fingerprints were lifted from the door of the victim's residence, but neither matched any prints of any of the suspects. *Id.* at *9.

3

During jury selection in 2003, after completion of the voir dire but before the jury was seated, the prosecutor announced that a hair under a fingernail scraping was also available for testing and the State asked whether defense counsel wanted testing done. *LaRue I*, 108 S.W.3d at 434. The defense filed a motion to suppress the results from the additional DNA testing, and after a hearing, the trial court concluded that the State's disclosure was untimely and that, because the State acted willfully, the DNA evidence should be excluded. *Id.* The State filed an interlocutory appeal of the trial court's suppression order. *Id.* at 433. In *LaRue I*, this Court concluded that the trial court erred in granting the suppression of the evidence. We reversed and remanded the case to the trial court. *Id.* at 437. The Court of Criminal Appeals affirmed this Court's judgment. *See State v. LaRue*, 152 S.W.3d at 100.

LaRue's case was reset for trial in March of 2005. *LaRue II*, 2007 Tex. App. LEXIS 4072, at *2. LaRue waived his right to a jury trial in exchange for the State's waiver of the death penalty. *See id.* at *2. At his trial, LaRue testified that he was with Pentecost at her home on the night she was killed, and that he had consensual sex with Pentecost that night but that when he left her she was alive. *Id.* at **1, 14-15. At trial, the State presented expert testimony regarding the testing of the biological material, which included the following:

4

> . . . the DPS crime lab reports concluded LaRue was the source of the semen on an oral swab from the victim. Pentecost and LaRue were excluded from the contributors of the stain on the cigarette butt. LaRue could not be excluded as the contributor of two stains from Pentecost's fingernail samples. Two fingerprints were lifted from the door of the victim's residence, but neither matched any prints of the suspects.

*Id.* at **8-9. A defense expert on forensic DNA testified regarding the fingernail samples that "[f]inding DNA samples under someone's fingernails would . . . not necessarily indicate whether it was deposited by a consensual or a non-consensual act." *Id.* at **19-20.

The trial court found LaRue guilty in April of 2005, and the court sentenced LaRue to life imprisonment. *See id.* at *1. LaRue appealed his conviction, and this Court affirmed. *See generally LaRue II*, 2007 Tex. App. LEXIS 4072. In our Memorandum Opinion we stated:

> The DNA testing showed LaRue's semen in Pentecost's mouth. [A witness] overheard LaRue tell another inmate that LaRue had sex with the victim and hit her in the head with a brick. The evidence shows that not until at least eight months after Pentecost's murder did LaRue include in any statements to law enforcement that he was with Pentecost the night she was murdered.
> . . . Based on the circumstantial evidence presented at trial, the trial court could have rationally concluded LaRue intentionally caused Pentecost's death.

*Id.* at ** 26-28. We concluded that the evidence was legally and factually sufficient to support the trial court's finding that LaRue intentionally killed Pentecost. *Id.*

In June of 2014, LaRue filed a "Motion for Forensic DNA Testing Pursuant to Art. 64.01 of the Texas Code of Criminal Procedure" (post-conviction motion) with the trial court, requesting further "re-testing" of the oral swabs from Pentecost, the hair found on Pentecost's hand, a cigarette butt, a bloody fingerprint found on a door, the fingernail scrapings taken from Pentecost, and "blood samples from a t-shirt worn by a potential suspect – Augustine[.]" *See* Tex. Code Crim. Proc. Ann. art. 64.01. In particular, in his post-conviction motion he argued that identification of the perpetrator was an issue at trial, and "there were clearly other contributors [of DNA material] – one of whom could likely be the actual perpretrator [sic]."

Both LaRue's post-conviction motion and the State's response thereto alleged that all of the items mentioned in LaRue's post-conviction motion were previously tested. LaRue alleged in his post-conviction motion that the testing that was previously done was "confusing[]" and produced "varying results." In his brief on appeal, LaRue challenges the "integrity of his blood sample" that was used for the DNA comparison on the swabs and stains. LaRue admits that he had oral sex with the victim before her death but he contends he established at trial by virtue of

6

an affidavit from Ron Singer[1] that there were "problems and inconsistencies with both the reports . . . which raised the possibility that defendant might not be the donor." LaRue claims that "Singer pointed out a possible error in labeling the male and female portions of the oral swab, as well as possible errors in interpretation. Those results could easily be the result of a contaminated sample." LaRue contends that a new blood sample taken from LaRue could then be compared to the oral swabs and that "there is a reasonable likelihood that new testing will produce more accurate results." As to the fingernail clippings, LaRue argues on appeal that the DNA was a mixture of his DNA with the victim's DNA and there could have been another contributor, or there is a possibility due to an issue as to the integrity of appellant's sample, that he might be excluded. With respect to the shirt taken from Augustine, another suspect, LaRue argues that Augustine was

> [o]ne of the suspects initially identified by police . . . a known drug dealer, who had provided drugs to the victim. . . . Police Chief Marsh talked with Augustine on August 18, and noticed blood on his shirt. . . . The shirt was taken as evidence, and submitted to the local lab, and later to the Texas Department of Public Safety. Initial testing indicated blood was on the shirt, but no results were ever obtained . . . While blood samples were taken from several suspects, no samples were taken from Augustine, and therefore no comparison could be made with him.

---

[1] LaRue states in his appellate brief that Singer is currently the director of the crime lab at the office of the Tarrant County Medical Examiner.

The State maintains that LaRue is not entitled to further DNA testing, that LaRue did not deny the existence of his DNA regarding various exhibits at trial, and that further DNA testing would not have prevented LaRue's prosecution or have negated his guilt. The State argued in response to the post-conviction motion that LaRue "does not contest the DNA results . . . admitted at trial. He merely 'suggests' that exculpatory results may point to other contributors."[2]

LaRue argues on appeal that the trial court erred in denying his post-conviction motion for DNA testing because "new tests [are] reasonably likely to produce more accurate results, and there [is] at least a 51% chance that appellant would not have been convicted if exculpatory results had been available during trial." In his brief, he challenges the "integrity of his blood sample[]" that was used in previous testing, and he argues that there is a reasonable likelihood that new testing would produce more accurate results. He admits his DNA profile was found on the fingernail scrapings from the victim, but he argues that "[i]f another contributor could be identified, that would place someone else at the scene." As to the t-shirt allegedly belonging to another suspect that LaRue identifies as

---

[2] The State alleges that when LaRue withdrew his election to have a jury assess punishment, he entered into certain stipulations concerning several of the exhibits that contained the DNA evidence.

8

"Augustine," LaRue asserts that, if the victim's blood were found on the shirt, it would also place Augustine at the scene.

STANDARD OF REVIEW

Generally, we review a trial court's decision on a motion for DNA testing under a bifurcated standard of review. *Whitaker v. State*, 160 S.W.3d 5, 8 (Tex. Crim. App. 2004). We afford almost total deference to the trial court's determination of issues of historical fact and issues of application of law to fact that turn on credibility and demeanor of witnesses. *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002). We review de novo other issues of application-of-law-to-fact questions that do not turn on the credibility and demeanor of witnesses. *Id.* In this case, the trial court did not conduct a live hearing; therefore, we review the trial court's denial of DNA testing de novo. *See Smith v. State*, 165 S.W.3d 361, 363 (Tex. Crim. App. 2005).

POST-CONVICTION DNA TESTING

There is no "free-standing due-process right to DNA testing[.]" *Ex parte Gutierrez*, 337 S.W.3d 883, 889 (Tex. Crim. App. 2011). Chapter 64 allows a convicted person to file, in the convicting court, a motion for post-conviction DNA testing of biological evidence. *Whitfield v. State*, 430 S.W.3d 405, 407 (Tex. Crim. App. 2014); *see* Tex. Code Crim. Proc. Ann. art. 64.01(a). "If the motion meets

9

specific requirements and the court grants the motion, article 64.04 requires that 'the convicting court shall hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted.'" *Whitfield*, 430 S.W.3d at 407 (quoting Tex. Code Crim. Proc. Ann. art. 64.04 (West Supp. 2014)).

A convicting court may order forensic DNA testing only if the statutory preconditions of Chapter 64 are met. *See Holberg v. State*, 425 S.W.3d 282, 284 (Tex. Crim. App. 2014); *Bell v. State*, 90 S.W.3d 301, 306 (Tex. Crim. App. 2002). Article 64 contains multiple threshold requirements that must be met before an applicant is entitled to such testing. *See, e.g.*, Tex. Code Crim. Proc. Ann. arts. 64.01 (motion), 64.03 (West Supp. 2014) (requirements; testing). The convicted person bears the burden of satisfying all Chapter 64 requirements. *See Wilson v. State*, 185 S.W.3d 481, 484 (Tex. Crim. App. 2006). A motion for post-conviction DNA testing may request testing of evidence "containing biological material." Tex. Code Crim. Proc. Ann. art. 64.01(a-1). As a threshold matter, therefore, the convicted person is required to show the evidence sought to be tested contains biological material. *Swearingen v. State*, 303 S.W.3d 728, 732 (Tex. Crim. App. 2010). Chapter 64 governs motions for forensic DNA testing and therein it defines "biological material" in relevant part as:

. . . an item that is in possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other identifiable biological evidence that may be suitable for forensic DNA testing[.]

Tex. Code Crim. Proc. Ann. art. 64.01(a)(1). On the motion of a convicted person, a trial court may order forensic DNA testing of the biological material only if (1) the court finds: the evidence still exists and is in a condition making DNA testing possible, and the evidence has been subjected to a sufficient chain of custody to establish that it has not been substituted, tampered with, replaced, or altered in any material respect; and (2) the court finds that identity was or is an issue in the case; and (3) the convicted person establishes by a preponderance of the evidence that: he or she would not have been convicted if exculpatory results had been obtained through DNA testing, and the request for testing is not made to unreasonably delay the execution of sentence or administration of justice. *Id.* art. 64.03(a).

The motion may request DNA testing only of evidence that either was not previously subjected to DNA testing or, although previously subjected to DNA testing, can be subjected to testing with newer testing techniques that would yield more accurate and probative results. *See id.* art. 64.01(b). For material that has previously been DNA-tested, the movant must do more than assert that new testing techniques would yield more accurate results; he must also show a reasonable

11

likelihood that the results of new DNA testing would be more probative. *See Routier v. State*, 273 S.W.3d 241, 250 (Tex. Crim. App. 2008).

The statute expressly requires a convicted defendant to show "by a preponderance of the evidence that . . . the person would not have been convicted if exculpatory results had been obtained through DNA testing[.]" *See* Tex. Code. Crim. Proc. Ann. art. 64.03(a)(2)(A). The Court of Criminal Appeals has interpreted the phrase "the person would not have been convicted if exculpatory results had been obtained through DNA testing" to mean a "greater than a 50% chance that he would not have been convicted if DNA testing provided exculpatory results. . . ." *Leal v. State*, 303 S.W.3d 292, 297 (Tex. Crim. App. 2009); *see also Holberg,* 425 S.W.3d at 286-87. "A 'favorable' DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity of the inmate's conviction; otherwise, DNA testing would simply 'muddy the waters.'" *Gutierrez,* 337 S.W.3d at 892 (quoting *Rivera,* 89 S.W.3d at 59). If the favorable or exculpatory test result would not change the probability that the inmate would still have been convicted, then there is no justification to order any testing. *Id.* The presence of another person's DNA at a crime scene, by itself, is not necessarily exculpatory. *See, e.g., Prible v. State*, 245 S.W.3d 466, 470 (Tex. Crim. App.

12

2008) (evidence of another person's DNA present at the scene in addition to appellant's was not exculpatory in light of other inculpatory evidence at trial).[3]

ANALYSIS

The State does not dispute LaRue's allegation that the identity of the killer was an issue, or that some evidence capable of biological testing still exists, or that such evidence has been subjected to the chain of custody requirements in Article 64.03(2). The State does not contend that LaRue's request for DNA testing is made to unreasonably delay the execution of his sentence or the administration of justice. Rather, the State argues that LaRue failed to establish by a preponderance of the evidence that he would not have been convicted if the request for DNA testing had produced exculpatory results.

To satisfy his burden under article 64.03(a)(2), LaRue is required to show how the results of the requested DNA testing would affect his conviction – that he would not have been convicted if the additional testing produced exculpatory results. *See Wilson*, 185 S.W.3d at 484. While the presence of LaRue's DNA on any material subjected to testing could indicate guilt, the absence of such DNA

_____

[3] Article 64.01(a-1) also requires that the motion be accompanied by an affidavit "containing statements of fact in support of the motion." *See* Tex. Code Crim. Proc. Ann. art. 64.01(a-1). The article "does not specify what facts" must be included in the affidavit. *Smith*, 165 S.W.3d at 362.

would not necessarily establish by a preponderance of the evidence that he would not have been convicted. *See Holberg*, 425 S.W.3d at 287-88 (exculpatory evidence does not necessarily negate other inculpatory evidence); *Swearingen*, 303 S.W.3d at 736 ("[A] movant does not satisfy his burden under Article 64.03 if the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing."); *Rivera*, 89 S.W.3d at 60 (presence of the victim's DNA under defendant's fingernails could indicate guilt, but the absence of such DNA would not indicate innocence). Similarly, even if new DNA testing shows that another person may have been present at the crime scene, that finding would not exonerate the defendant because "it would show nothing more than there was another party to the crime, at best." *Wilson*, 185 S.W.3d at 485; *see also Prible*, 245 S.W.3d at 470 ("[E]ven if the evidence was retested and determined to contain another person's DNA in addition to Appellant's DNA, it would not establish by preponderance of the evidence that Appellant would not have been convicted if the jury had heard that DNA from a third-party was present."); *Hood v. State*, 158 S.W.3d 480, 483 (Tex. Crim. App. 2005) (holding that, given other inculpatory evidence at trial, "[e]ven if DNA tests revealed the blood of another individual at the crime scene . . . that evidence would at most establish that [defendant] acted with someone else in committing the crime").

14

## Previous Blood Testing

In his motion for post-conviction DNA testing, LaRue argued that in 1990, when testing blood samples taken from him, one crime lab determined his blood was type A and another crime lab determined his blood was type O. Although LaRue generally referenced crime lab reports in his post-conviction motion, he did not attach copies of such reports and he did not cite to an exhibit or other portion of the trial record. LaRue argued in his post-conviction motion that such "varying results . . . should be sufficient to raise concerns about the reliability and validity of the results."

Because LaRue's blood was previously tested, he must establish that "newer testing techniques [would] provide a reasonable likelihood of results that are more accurate *and probative* than the results of the previous test." Tex. Code Crim. Proc. Ann. art. 64.01(b)(2) (emphasis added). LaRue contends in his brief on appeal that if another blood sample is taken from LaRue and then it is compared to the swabs, stains, and presumably the nail clippings that "there is a possibility that subsequent testing would exclude appellant." LaRue admitted at trial and later in his brief on appeal that he had consensual sex with the victim on the evening of her death. *LaRue II*, 2007 Tex. App. LEXIS 4072, at **14-15. Therefore, even if he is correct in his argument that there is a possibility that further testing would exclude LaRue

from matching the swabs and semen taken from Pentecost, he has failed to explain how such results would affect his conviction in light of other inculpatory evidence; additionally, even assuming new tests of LaRue's blood would be more accurate, LaRue has not established that new results would be more probative than the evidence the trial court considered.

Fingernail Scrapings

LaRue's post-conviction motion made no specific argument concerning retesting the fingernail scrapings. In his brief on appeal, he generally argues that although "defendant's profile was found on the fingernail scrapings, the results established a mixture. If another contributor could be identified, that would place someone else at the scene." LaRue fails to cite to a particular test result or to any part of the trial record in support of this argument.

In reviewing LaRue's appeal of his conviction, we stated in our opinion in *LaRue II* that "LaRue could not be excluded as the contributor of two stains from Pentecost's fingernail samples." *Id.* at **8-9. We also noted that a DNA expert for the defense had testified that DNA material under someone's fingernails would not necessarily indicate whether it was deposited as a result of consensual or nonconsensual conduct. *Id.* at **19-20. LaRue himself testified he had consensual sex with Pentecost that night, and further that Augustine was at Pentecost's house

16

the night she was murdered. Accordingly, LaRue put himself at the scene of the murder and further by LaRue's own testimony, no exculpatory DNA results would be necessary in order to "place someone else at the scene." *Id.* at *15. Therefore, even if retesting fingernail scrapings were to establish a mixture of LaRue's and someone else's DNA, there is no indication such would be more probative than the evidence the trial court considered.

Augustine's T-shirt

In his brief on appeal, LaRue argues that "[i]nitial testing indicated blood was on the shirt, but no results were ever obtained." He further suggests that "if the blood on Augustine's shirt belonged to the victim that would be exculpatory[,]" and it would place Augustine at the scene of the crime. In reviewing LaRue's appeal of his conviction in *LaRue II*, we noted that "[w]hile a shirt of Augustine's tested positive for human blood several days after the murder, the blood could not be typed." *Id.* at *18.

As we have already explained, LaRue himself testified that Augustine told LaRue that Augustine was going to Pentecost's house on the night of the murder. LaRue also gave an "In Custody Statement" to the police, which was admitted into evidence at trial, wherein he stated that Augustine was at Pentecost's house on the night of the murder, that Augustine hit her during an argument, and that another

17

person with Augustine grabbed a brick and struck Pentecost. *Id.* at **17-19. Therefore, even if the blood found on Augustine's shirt could now be typed or matched to Pentecost, such results would not be more probative than the evidence that was already before the trial court.

On the record before us, we conclude that, even if the evidence in question were retested and yielded results that were consistent with LaRue's allegations, it would only show that an additional person was at the scene or, at most, may have been involved in the crime, and LaRue did not meet his burden of establishing, by a preponderance of the evidence, that he would not have been convicted of Pentecost's murder. *Wilson,* 185 S.W.3d at 486; *see also Prible,* 245 S.W.3d at 470. The trial court did not err by denying LaRue's motion for post-conviction forensic DNA testing. *See* Tex. Code Crim. Proc. Ann. arts. 64.01(a), (a-1), (b), 64.03(a). We affirm the trial court's order denying LaRue's motion.

AFFIRMED.

---

LEANNE JOHNSON
Justice

Submitted on March 19, 2015
Opinion Delivered October 28, 2015
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.

18

IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF TEXAS

JOE EDWARD LARUE                    *
    Appellant                      *
                                   *
vs.                                *__PD#_____
                                   * COA #10-15-00032-CR
                                   *
                                   *
THE STATE OF TEXAS                 *
    Appellee

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(3), I hereby certify that the Appellant's brief filed in this cause contains 2,653 words. The document was prepared using Wordperfect 12, and the word count was generated using that program.

/s/ Walter M. Reaves, Jr.
Walter M. Reaves, Jr.
100 N. 6th Street, Suite 802
Waco, Texas 76701
(254) 296-0020
FAX (877) 726-4411
TBA# 16644200
Walterreaves@att.net

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing certificate was mailed to the Office of the District Attorney for Jefferson County, Texas, on December 30, 2015

/s/ Walter M. Reaves, Jr.
Walter M. Reaves, Jr.

8